May it please the Court, Nancy Spiegel, for Plaintiff Appellate, United States of America. I'd like to reserve two minutes of my time for rebuttal. I'm sorry? I'd like to reserve two minutes for rebuttal, please. In this case, the District Court erred in granting a three-level departure based on cultural assimilation, and the Court also erred in granting a three-level downward departure based on a combination of factors which included lesser harms, family circumstances, and jury sympathy. In this case, the PROTECT Act standard overview, the de novo standard overview, applies. This case, the Act is not retroactive, and it doesn't violate the ex post facto provisions of the Constitution. And applying that Act, or in the alternative, if the abuse of discretion standard still applies, the District Court's decision still should be vacated. Under the cultural assimilation argument, United States v. Lipman is the primary case, and in that case, this Court found that facts very similar to the facts in this case were not sufficient to take the case outside the heartland of the guidelines. In that case, as well as in this case, the defendant had lived in the United States for a long time, many years, since childhood, had been educated here, and had many family members here, as does the defendant in this case. However, there were no other factors adduced at trial or at sentencing to show anything extraordinary about this case that it should be taken outside the heartland. So on those grounds, the government contends the departure was in error. Regarding the combination of factors departure, that was a three-level departure. Looking at each of the three individual factors, as well as the factors in combination, the government contends that this departure was also in error, starting with the first factor the District Court found, which was the lesser harms argument, based on the fact that defendant was 4 feet 2 inches tall or a dwarf. On a lesser harms departure, the defendant has to show both a perceived greater harm from not violating the law in this case. Her contention was that by remaining in Mexico following deportation, she would be harshly treated due to her status as a dwarf. And there, the only facts she adduced at trial were that when she was living in Mexico at the age of 10 and younger, she had been teased in school. So she failed to meet her burden of showing, at this point in time, following any of her three deportations to Mexico, that she was subjected to any form of harsh treatment there. Is there any evidence that went the other way? I think she's the only source of evidence as to conditions or treatment in Mexico of dwarfs. Isn't that right? That's correct. And it is her burden to show that there would be a greater harm. Right. But she's presented some evidence. It may be a little slender. But you presented none. That's correct. And our argument on this point is that that evidence that she did present isn't sufficient. Right. And it also, you have to balance it against a diminished societal interest in punishment, whether that harm outweighs it. And here, the government's contention, of course, is that it doesn't diminish. And for that, we rely on our best cases, United States v. Thompson, which was a child pornography case. And this court found that both under a combination of factors analysis and a single factor analysis, the facts weren't sufficient. Defendant's next contention, and the second ground for the court's departure, is based on the fact that defendant had an infant when she was arrested this time around. She contends that the departure first on a lesser harms ground fails because she can't contend that she either illegally reentered the country so that she wouldn't be separated from her infant, because when she did reenter the last time, she was neither pregnant nor had this child yet. So the other ground, family circumstances, it is a disfavored ground under the guidelines. And again, she hasn't adduced any facts sufficient to take it outside that heartland. Most defendants, many defendants, have families. This court has held many times that that's not a sufficient ground, and we would rely on Burlier and Miller for that proposition. Finally, the last factor the court relied on was sympathy expressed by the jury in a jury note after it had returned its verdict, stating or requesting, recommending leniency in the defendant's sentencing. Here, our argument is that, first of all, this is an improper ground upon which to depart. Jury sympathy has, and any sort of jury opinion in the matter of sentencing, has no place here, especially on these facts where the jury had incomplete information. The jury made a statement that it felt that this defendant had been punished enough. Well, the jury doesn't know about the guidelines and how the guidelines operate, had no idea about this defendant's very extensive criminal history, the fact that she had reentered the country three times, the fact that she had already been prosecuted for 1326 before. Did they know about the prior conviction with respect to the beating and the stabbing of the old man? Not the facts of that conviction, no, Your Honor. They just knew the label of the conviction and the time served. Exactly. Did they know it was attempted murder, or did they know it was a felony? I think all they knew was that she had a prior conviction for an aggravated felony. But not what the felony was? Not what the felony was, no, absolutely not, nor the facts underlying it. And the government would respectfully request that this court vacate the sentence and remand for resentencing with specific instructions to the district court not to depart on any additional grounds as provided for in the new Section 3742-T2. If there are no further questions, I will reserve the balance of my time. Thank you, Ms. Beagle. Good morning, Your Honors. May it please the Court, my name is Jonathan Libby, and I appear on behalf of the appleee, Leticia Paniagua-Ortiz. Let me begin by saying, notwithstanding the government's arguments, Judge Takasugi properly exercises discretion in granting these two departures. The two departures are well supported by the record. This Court should give substantial deference to that decision and should affirm this Paniagua sentence. The government has asked this Court to essentially limit Litman and argues that the Court should essentially exclude, if a defendant has extensive criminal history or has multiple reentries, that that automatically disqualifies a defendant from cultural assimilation. Obviously, this Court never said that in Litman. It did seem to suggest that those are factors that may be considered by the District Court in making a departure decision, and we certainly agree with that. Those are certainly considerations for the District Court in reaching a departure decision, and I believe that certainly Judge Takasugi took those considerations into account when he decided to grant this departure. Now, with respect to cultural assimilation, Ms. Paniagua came to the United States. She was brought to the United States when she was 10 years old, lived here for 27 years. Her entire family lives here, most of whom are U.S. citizens. She has two children who are U.S. citizens. She attended elementary through community college here. And her reason for returning to the United States each time was strictly for familial reasons, which in Litman, this Court said, was a legitimate basis for granting a departure for cultural assimilation. There were no economic reasons, which this Court said could be a reason to decline to give a departure under Litman. Now, the government often cites the facts of Litman as somehow establishing the baseline facts for cultural assimilation departures. I would submit that contrary to what the government has suggested in its briefing, Ms. Paniagua is in a much better position than the defendant was in Litman, particularly the fact that when Mr. Litman came to this country, he said it was to be with his daughter in New York. He, in fact, was found in Los Angeles when he was arrested with 39 pounds of marijuana. So there, in fact, were perhaps some economic reasons that Litman came to this country, and that was why the departure was not given in that case. Let me ask you this. Suppose you're right. Suppose she's entitled to the cultural assimilation reduction. She serves her time, gets deported again, comes back. Is she charged again with 1326? Is she entitled to cultural assimilation again? Well, she's certainly entitled to ask for a departure for cultural assimilation again. The same. I mean, she came at 10 years old and so forth. Absolutely. And certainly the government is entitled... Now she's convicted and sent to prison, goes back again and comes back, charged yet again. And she'd get the cultural assimilation reduction. That again would be up to the judge to make that decision. I assume the government would argue the fact that she had previously received this departure and it didn't seem to make a difference, and therefore... Well, that's what they're arguing, that she's been deported how many times before? I believe three, Your Honor. And in addition to the three departures, she's also got a prior conviction for this? She does, Your Honor. And a lot of her recent time in the United States was sent in prison for the attempted murder. From, I believe, 1990 to 1995, she served five years on the attempted murder. At some point, does this get cut off, that she doesn't continue to get the benefit of a cultural assimilation? Well, I think certainly at some point the district court judge would deny such a departure. And obviously this court could say that, yes, that was an abuse of discretion given the multiple times. I'm afraid we've got the PROTECT Act somehow involved in this case. Yes, Your Honor. And our position is, as we stated in our supplemental brief, the PROTECT Act does not apply to this case. That to apply the PROTECT Act would violate the presumption against retroactivity of new statutes and would violate the ex post facto clause. The change, in fact, benefits the government to the detriment of the defendants. In terms of the anti-retroactivity principle, if one looks at the Lynn case, which the Supreme Court looked at the change in the standard of review in Habeas cases, where the change in the standard went from de novo to deferential review, the court found that that violated the anti-retroactivity principle because the change affected a substantive ensettlement relief through a change in the standard of review, which benefited the government. Similarly, in this case, the change in the standard of review benefits the government. The government, under the old standard, had to come to this Court and demonstrate that the lower court abused its discretion. Now, of course, the statute applies to upward and downward departures. That's correct, Your Honor. And with respect to upward departures, and I know the government has cited some cases in which courts have applied in upward departures, we would submit there's certainly no ex post facto violation with respect to the change in the standard for an upward It's not the overall effect of the statute, but we look at one application. As applied to defendants who receive downward departures is where it would violate the ex post facto clause. And I would also note, with respect to the ex post facto clause, this Court, in a case that neither party had cited, it was United States v. $814,254.76 in U.S. currency. The Court noted that a seemingly procedural change, one seemingly procedural change that is forbidden by the ex post facto clause is a lowering of the government's burden of proof. And as I said, that isn't exactly what is taking place here with respect to downward departures. Now, with respect to the other departure, which was for a combination of factors, the entire point of a combination of factors departure is that no one factor merited on its own a downward departure. So the fact that — and I would certainly agree that the facts in this case would not have merited a downward departure on each of the individual factors that the Court considered. But each of those factors in combination made this a unique case. It made this case extraordinary. And that's what took it outside the heartland. And that is what Judge Takasugi found, that, in fact, dwarfs do face harsher treatment in Mexico. And, in fact — What was his basis for finding that? I believe it was the testimony of Ms. Paniagua. Which was that she was teased when she was younger. Exactly. That she faced the harsher treatment when she was younger. She also did make a statement — Well, Your Honor, and to that I would say certainly a district court is certainly entitled to use his own personal knowledge of facts. I'm not sure — Did he take judicial notice of some experience he's had? He did not indicate anything. But I would also note that the second addendum to the pre-sentence report, the probation officer also notes that it is likely that dwarfs face harsher treatment in Mexico. So, in fact, the probation officer also — What was the basis for that? I don't know, Your Honor. In terms of the evidence that she's presenting, she says specifically that she was teased when she was in school. Now, lots of kids are teased when they're in school. Some of them because they're too short, and some of them because they're too tall, and some of them because they're too something else. Nonetheless, here she is a person with some genuine experience, both being a dwarf and being in Mexico, and I'm not sure that we need to confine ourselves to her evidence with respect only to the specific example she gave. It's almost racist to say that Mexicans treat dwarfs more poorly than other countries without any kind of evidence of that. Well, again, all I can say is that Ms. Paniagua is, in fact, a dwarf who has lived in Mexico and has faced harsher treatment. So — If she had said, you know, I've lived in Mexico and I've lived in the United States and I can tell you Mexico is terrible, okay, then there's some basis for it. Well, and that is, in fact, what Ms. Paniagua said. I thought what she said was when I was a little kid I got teased in school and then sat down, you know, period. Well, and that's correct, Your Honor. But, of course, she did live in this country the overwhelming majority of her life and did not seem to feel that same harsh treatment. So, you know, again, this was a factor that the court considered in combination with the other factors, the separation from her seven-week-old daughter. The court found that was particularly troublesome for Ms. Paniagua as a mother to be separated from her newborn infants. Did she have custody of that child? She did, Your Honor. And when the INS found her, it was in her home with the child, and they, in fact, then arrested her. And the child then was given to the father to take care of. But, yes, she, in fact, had custody of the child at the time. And then, of course, there was what the court found was the unusual request from the jury, which was an expression of sympathy. The jury essentially found we are finding her guilty because under the law we have to, but that we essentially did not really want to find her guilty. And that certainly is a proper consideration for the court to take into account in a combination of factors, departure. The government cited to the Second Circuit's Nickens case, which says just that, that this is a factor to be considered in combination with everything else. Thank you, Mr. Libby. Thank you. Ms. Spiegel, any rebuttal? Just briefly on the PROTECT Act and the standard of review, as this Court has pointed out, the standard of review does apply to both upward and downward departures. There are two circuits, as we've cited in our letter to the Court last week, the Eighth Circuit and the Tenth Circuit, that have applied the de novo standard of review to both cases involving upward departures. So for the defense to say that as applied to this particular case, applying the de novo standard of review is harmful to his client really shouldn't be considered because it's the Act as a whole. In one case, it will benefit the government. In one case, it could potentially benefit the defendant. And in U.S. v. Dobert, or Dobert as we cited to the Court in the letter yesterday, that was a case involving a change in how the death penalty determination was made, and it gave more power to the judge than the jury. And the Supreme Court found that that new law applied, and it wasn't retroactive because. . . Yeah, but let me talk sort of. . . I'm not sure what the legal consequence is, but we all know what lies behind the Feeney Act or the Feeney Amendment or the so-called PROTECT Act. It's Congress's unhappiness with downward departures. And the record is very clear. . . The record upon which Congress relied is very clear, that courts in increasing numbers were giving downward departures. They were not giving very many upward departures, and this statute was clearly intended to get rid of or at least make more difficult this large number of downward departures. So yes, there are some upward departures, and yes, the Act also applies to the upward departures, but the clear intent of Congress was to attack and make more difficult downward departures. Isn't that correct? That is correct, yes. But the language of the Act itself applies equally to both sorts of departures. That's right. Okay. And addressing defense counsel's points regarding cultural assimilation, United States v. Lipman involved a balancing of the facts that the defendant felt took his case outside the heartland versus, as the district court found and this court found, the criminal history and other sort of aggravating factors. And so here, when you balance the fact that this defendant reentered the country three times, that the defendant has a long and very serious and violent criminal history against the facts that she posited in mitigation, I think there's no question that cultural assimilation shouldn't be applied to her. And as this court suggested, there has to be a cutoff at some point when a defendant has repeatedly reentered, reentered, reentered, and the government says, no, you can't come back, you can't come back, you can't come back here. This happened three times. I think that's enough. Regarding the lesser harms argument, the district court itself stated at sentencing that the record was barren regarding what would happen to the defendant in Mexico now. And the defendant herself stated at sentencing that she would go and live in Tijuana with her child and the husband of her child. So I think those facts do argue against any facts she put in favor of the fact that she'd be treated poorly due to her dwarf status. She hadn't lived there in 27 years. She hadn't stayed long enough after any of the deportations to experience, to have anything to say. She was culturally assimilated in Mexico. Well, she hadn't stayed long enough, though, to be able to report to the court how she would be treated now as an adult of this stature. Thank you very much, Ms. Spiegel. The case just argued is submitted. Thank you, too.
judges: Silverman, W Fletcher, Rawlinson